IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSEPH T. RYERSON & SON, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 06-883 |
| | ) | |
| KASGRO RAIL CORPORATION, | ) | Judge Cercone |
| Defendant. | ) | Magistrate Judge Mitchell |
| | ) | |

REPORT AND RECOMMENDATION

I.      Recommendation

It is respectfully recommended that the motion for partial summary judgment submitted

on behalf of Plaintiff, Joseph T. Ryerson & Son, Inc. (Docket No. 45), be denied.  It is further

recommended that the motion for partial summary judgment submitted on behalf of Defendant,

Kasgro Rail Corporation (Docket No. 49), be denied.

II.      Report

Plaintiff, Joseph T. Ryerson & Son, Inc. ("Ryerson"), brings this action against

Defendant, Kasgro Rail Corporation ("Kasgro"), alleging breach of contract under Pennsylvania

law.  Plaintiff alleges that Defendant has not paid the sum of $788,204.76 for a shipment of steel

goods that it supplied as per the contract between the parties.  Defendant has filed a counterclaim

for breach of contract, in which it contends that Plaintiff failed to deliver goods by the dates

specified and that these delays caused it to incur damages, for which it seeks recovery.

Presently before this Court for disposition are cross-motions for partial summary

judgment.  Ryerson seeks payment in the amount of $788,204.76, plus unpaid interest, but does

not seek summary judgment with respect to Kasgro's defense of setoff or counterclaim.  Kasgro

seeks summary judgment on the issue of Ryerson's liability to it for the reasonable expenses it incurred incident to Ryerson's failure to timely deliver the contract goods, but not on the amount of damages. For the reasons that follow, both motions should be denied.

Facts

Ryerson is a distributor and processor of a broad range of metals. It stocks a large supply of metal products and fabricates metal goods to specification as ordered. (Compl. ¶ 6; Answer ¶ 6.)[1] Kasgro is a manufacturer of railroad cars. (Plut Dep. at 21[2]; Plut Aff. II ¶ 2.[3])

In early February 2005, Kasgro entered into a contract with Loram Maintenance of Way, Inc. ("Loram") to build the "base car" portion of 81 "spine cars" that Loram would use in providing maintenance of way services to its railroad customers. (Lowe Dep at 14-15;[4] Plut Dep. at 31; Plut Aff. II ¶ 2.)

In late February 2005, a Kasgro engineer, Jon Odden, contacted Ryerson's Senior Account Manager, Kent Bowman, with information on the steel parts that Kasgro would need for

---

[1]Docket Nos. 1, 6.

[2]Unless otherwise noted, all excerpts from Jeffrey Plut's deposition are contained in Plaintiff's Appendix to its Motion for Partial Summary Judgment (Docket No. 47) Ex. 13.

[3]Kasgro Executive Vice President and Chief Financial Officer Jeffrey Plut executed two affidavits in this case. The first affidavit (Docket No. 52), dated April 16, 2008, ends at paragraph 8 with the assertion that Kasgro incurred the expense of paying a plant full of employees to do nothing. In the second affidavit (Def.'s App. Br. Opp'n Pl.'s Mot. Partial Summ. J. Ex. 2, Docket No. 57), dated May 16, 2008, Plut reiterates the same first 7 paragraphs as the first affidavit, but beginning at paragraph 8, he goes on to describe his meetings with Ryerson personnel to complain and explains how Kasgro is calculating its damages. All references herein will be to the second affidavit except for the assertions of paragraph 8 of the first affidavit.

[4]Docket No. 47 Ex. 11.

the Loram job. Odden requested that Ryerson provide a quote to Kasgro for these parts. (Bowman Aff. ¶¶ 2, 4-5.)[5] In addition, Kasgro solicited two other steel suppliers, American Tank and O'Neal Steel, to provide quotes with respect to the Loram job. Ultimately, it received written quotations from all three potential vendors. (Plut Aff. II ¶ 2; Kahrer Aff. ¶ 2;[6] Odden Dep. I at 55-62.[7])

The Ryerson Quote

Ryerson quoted the project (the "Ryerson Quote") on March 9, 2005. (Odden Dep. I at 60-61; Plut Aff. II ¶ 3; Bowman Aff. ¶ 9.)

At the bottom of the first page of the Ryerson Quote, the following language appears:

> This quotation does not constitute an offer, please contact the sender for a complete set of terms and conditions governing this quotation. Quoted prices subject to surcharges imposed at the time of shipment.

(Plut Aff. II Ex. A.) Ryerson contends that the "terms and conditions" referred to in the quotation are its Conditions and Terms of Sale, which state, in pertinent part:

> Any shipping schedule is approximate. We shall not be liable for any delay in delivery or failure to deliver caused for any reason in whole or in part beyond our reasonable control including but not limited to production schedules of the producing mill, unavailability of materials, labor disturbances, acts of God, transporting difficulties or causes which abnormally increase the cost of performance. Should shortages in our supply occur for any reason, we may allocate the material in such manner and amount as we may determine. Acceptance by you of any goods shall constitute a waiver by you of any claim for

---

[5]Pl.'s App. Br. Opp'n Def.'s Mot. Partial Summ. J. (Docket No. 62) Ex. 28.

[6]Docket No. 53.

[7]Jon Odden's deposition was taken on two occasions: on June 21, 2007 ("Odden Dep. I") and on January 3, 2008 ("Odden Dep. II"). Unless otherwise noted, all excerpts from Odden Dep. I are contained in Docket No. 62 Ex. 5 and all excerpts from Odden Dep. II are contained in Docket No. 62 Ex. 6.

damages on account of any delay in delivery of such goods.

(Docket No. 62 Ex. 10.)  These Conditions and Terms of Sale are available on the Internet and in

Ryerson's catalog, known as the "Stock List" or "Red Book."  (Docket No. 62 Exs. 10, 11.)

Ryerson also notes that Kasgro had a copy of the Stock List at its New Castle, Pennsylvania

facility.  (Docket No. 62 Ex. 29.)

Kasgro denies that the Conditions and Terms of Sale were included in the basis of the

parties' bargain, observes that Ryerson has not demonstrated that what is posted on its website

today was also there in 2005 and notes that Ryerson's website also promises "On Time Delivery.

Every Time" to its customers, including Kasgro.[8]  Kasgro also states that, although it was

eventually able to locate one copy of the Stock List at its facility in New Castle, it was not

ordering stock parts from Ryerson's Stock List, but custom fabricated parts and therefore it had

no reason to review or consult the Stock List.

Ryerson's Kent Bowman states that:

> I would most likely have discussed Ryerson's ability to quote the project
> with other Ryerson employees, including representatives of the Inside Sales and
> Fabrications Sales Departments.

> Jon Odden and I would also likely have discussed at some point the
> delivery dates Kasgro wanted.

> I would also have discussed the feasibility of these dates with other
> Ryerson employees.  Delivery dates for our products depend on many factors,
> including receipt of steel from the mills, scheduling of burning and fabrication
> space at our facilities, scheduling of those activities at outside fabrication shops
> and availability of in-house delivery, and I wanted to be in a position to offer a fair
> estimate to Kasgro.

---

[8]This statement appears on a page of Ryerson's website entitled Big 5 Commitment,
listing five reasons to select Ryerson.  See http://www.ryerson.com/corporate/big5.asp.

Ultimately, Ryerson issued a Sales Quotation dated March 9, 2005, to Kasgro for the steel needed to build one prototype rail car and 80 additional rail cars.

Ryerson's Sales Quotation did not contain specific delivery dates.

Ryerson's Sales Quotation set forth the prices at which we were prepared to sell goods subject to our Conditions and Terms of Sale.

Our Conditions and Terms of Sale appear in our catalog (the "Red Book"), which, from my years of work in the metals industry, I understand to be distributed widely and referred to frequently throughout the industry.

Our Conditions and Terms of Sale state that Ryerson does not guarantee specific delivery dates, and, in my experience, Ryerson does not do so.

I understand from my years of work at Ryerson that part of the reason why Ryerson is unable to guarantee delivery dates is because, in certain cases, we are dependent on steel mills and third-party shops.

During my 35 years at Ryerson, to my knowledge, Ryerson has never accepted an order that included a penalty clause if Ryerson was not able to meet delivery dates.

I did not ever guarantee to Jon Odden or anyone else from Kasgro that Ryerson could meet specific delivery dates for goods that Kasgro might order.

On the basis of my phone conversation and other communications with Jon Odden, I did not understand Kasgro to be requesting a guarantee of delivery dates.

(Bowman Aff. ¶¶ 6-17.)  Bowman similarly testified at his deposition that Ryerson is not

obligated to hit delivery dates because "there are not absolutes.  Things can happen."  (Bowman

Dep. at 137-38.)[9]  See also Bowman Dep. at 142-43 (Ryerson merely said that it would try to

make delivery dates; Ryerson would not have taken the order if there were penalties attached to

missing delivery dates, although that fact was not communicated to Kasgro); Bergmann Dep. at

---

[9]Unless otherwise noted, all excerpts from Kent Bowman's deposition are contained in Docket No. 62 Ex. 2.

21, 92 ("we don't guarantee delivery dates").[10]

Kasgro asserts that the price quotation was not intended to be an offer from Ryerson, and that the parties did not intend the terms included on that quote to form a contract between them. (Bergmann Dep. at 44; Bowman Dep. at 56-57.[11]) Ryerson responds that Kent Bowman explained that he understood the phrase "this quotation does not constitute an offer" to mean that it was subject to Ryerson's Conditions and Terms of Sale. (Bowman Dep. at 57.) It further asserts that Brian Bergmann testified that it is Ryerson's position that Ryerson will not be bound to a quotation, and that its quotes are subject to its Conditions and Terms of Sale. (Bergmann Dep. at 43-44.)

In order to manufacture the Loram railcars, Kasgro had to specially configure its plant and equipment, allowing for only the manufacture of that product. (Kahrer Aff. ¶ 4.) Kasgro states that it informed Ryerson that the unique set up of its plant meant that it would be limited to building only the Loram railcars and that the Loram job would require Kasgro to produce railroad cars by strict deadlines. (Kahrer Aff. ¶¶ 3-4.)

Kasgro's Jeff Plut states that:

> After receiving [Ryerson's] price quote, Kasgro and Ryerson engaged in contract negotiations. During those negotiations, Kasgro informed Ryerson that to accommodate the Loram build, Kasgro needed to bring different jigs and fixtures into its plant and reconfigure its assembly line. Because of the unique set up, Kasgro would not be able to use the plant for any purpose other than to manufacture the railcars that incorporated Ryerson's components. This being the case, every employee hour and all overhead costs of the plant would necessarily be allocated to the Loram job. As such, for the Loram job to be profitable, Kasgro had to have the steel parts delivered on time.

---

[10]Docket No. 62 Ex. 1.

[11]Def.'s App. Br. Support Mot. Partial Summ. J. (Docket No. 54) Ex. B.

(Plut Aff. II ¶ 4.)

Ryerson contends that Kasgro never said that it had to reconfigure its plant and that it had no independent knowledge of this purported reconfiguration. (Bowman Dep. at 165; Mondine Dep. at 109-10.[12]) Further, Ryerson asserts that Kasgro did not indicate that the Loram job would require Kasgro to produce railroad cars by strict deadlines.

The parties agree that Ryerson evaluated the size and scope of the job, and determined that Kasgro's proposed dates were "doable." (Bowman Dep. at 76, 134.) Ryerson notified Kasgro shortly thereafter. (Bowman Dep. at 76.)

<u>The Kasgro Purchase Orders</u>

By two purchase orders dated March 18, 2005 (the "Purchase Orders"), Kasgro ordered steel goods from Ryerson for the Loram job. The value of the parts identified in the Purchase Orders totaled $2,347,455.36. (Kahrer Dep. at 26;[13] Bowman Dep. Ex. 4;[14] Bowman Dep. Ex. 5;[15] Plut Dep. at 43.)

Jeff Plut states that:

> Kasgro informed Ryerson that it needed specific parts by specific dates. Ryerson assured Kasgro that steel parts would be delivered on time. Accordingly, on or about March 18, 2005, Kasgro submitted a purchase order to Ryerson, which identified the strict dates by which specific quantities of steel had to be

---

[12]Unless otherwise noted, all excerpts from Jo Mondine's deposition are contained in Docket No. 62 Ex. 4.

[13]Docket No. 47 Ex. 10. Unless otherwise noted, all excerpts from Chas Kahrer's deposition are contained in Docket No. 62 Ex. 3.

[14]Docket No. 47. Ex. 4.

[15]Docket No. 47 Ex. 5.

delivered....

(Plut Aff. II ¶ 5.)  As Kasgro notes, the Purchase Orders identified the following dates by which specific quantities of steel were to be delivered, namely: May 27, June 3, June 10, June 17, June 24, July 1, July 8, July 15, and July 22, 2005.  (Plut Aff. II Ex. B.)

Ryerson denies that it made any assurances that Kasgro's timeline could be met other than its belief that Kasgro's proposed dates were "doable."  (Bowman Dep. at 76.)  In his affidavit, Ryerson's Kent Bowman states that:

> If I had understood that Kasgro required a guarantee of specific delivery dates or that delivery dates on the Kasgro Purchase Orders were intended to be contractually guaranteed deadlines, I would have recommended that Ryerson reject the Kasgro Purchase Orders.
>
> Based on my 35 years of experience with Ryerson and the metals industry, I did not believe that Ryerson would have accepted Kasgro's Purchase Orders if it had understood that Kasgro demanded guaranteed delivery dates.
>
> To my knowledge, Ryerson did not guarantee delivery dates to Kasgro Rail Corporation in 2005 or at any other time.

(Bowman Aff. ¶¶ 18-20.)

However, Kasgro notes that Ryerson's Brian Bergmann testified as follows at his deposition: "The fact that [Ryerson] quoted these items in that time frame and [Kasgro] sent back a confirming [purchase order], I would say, yes, there was an agreement on what those delivery dates were going to be."  (Bergmann Dep. at 43.)

The parties agree that, a short time after Kasgro's Purchase Orders were submitted, Ryerson accepted them without modification and began to perform on the contract.  (Kahrer Aff. ¶ 5; Plut Aff. II ¶ 5.)  Specifically, Ryerson began ordering materials from its suppliers on March 21, 2005 and began to deliver steel for production of rail cars in May and June of 2005.  (Docket

No. 62 Ex. 14; Docket No. 57 Ex. 4.)

Ryerson fabricated steel based on drawings it received from Kasgro. (Bowman Dep. at 69-70, 103, 110.) Kasgro notes that, on numerous occasions, Ryerson's fabricated parts were incorrect and had to be re-worked. (McFall Aff. Ex. A.)[16] Kasgro also states that it often modified the parts itself to keep production moving. (Odden Dep. I at 104.)[17]

Ryerson states that, on numerous occasions subsequent to Ryerson's placing orders, Kasgro revised the drawings. Several of these revisions came after the date on which Kasgro claims Ryerson was obligated to begin making deliveries. Ryerson received at least six revised part drawings from Kasgro on or about June 10, 2005, which was the third date listed on the Kasgro Purchase Orders. See, e.g., Kahrer Dep. at 70-72; Docket No. 62 Exs. 16, 19-22, 31.

Kasgro responds that it occasionally made very minor changes in the drawings, such as changing a hole drilled in a part to a larger diameter, and that it often modified the parts itself to keep production moving. (Odden Dep. I at 104, 107.)[18]

Ryerson states that it viewed the Kasgro Purchase Orders as "a rush, a push, a hurry," that it was using all of its best efforts to try to satisfy its customer, Kasgro, and that it believed it was succeeding in its endeavors through July 2005. (Bowman Dep. at 150, 157-60, 182.)

<u>Problems Arise</u>

Kasgro states that, over the first few months of the contract, Ryerson generally adhered to the contract's strict delivery dates. (Plut Aff. II ¶ 6.) However, by mid-June, 2005, Ryerson was

---

[16]Docket No. 57 Ex. 1.

[17]Def.'s App. Reply Br. Support Mot. Partial Summ. J. (Docket No. 70) Ex. 1.

[18]Docket No. 70 Exs. 1, 2.

unable to supply the parts (Sill Plates) by the contract dates, forcing Kasgro to shut down its production. Kasgro states that this was the first of many times that it would be forced to stop production (or operate at less than capacity) due to Ryerson's failure to timely deliver parts. (Kahrer Aff. ¶ 6.) Jeff Plut explains that:

> Much like the frame of an automobile, the Sill Plate is the part of the railroad car to which virtually every other part attaches. This includes, but is not limited to, the wheels, the brakes, and the top deck assemblies. The Sill Plate was the key to building the Loram railcars. Without this part, the build could not continue.

(Plut Aff. II ¶ 6.)

Ryerson notes that, through July 22, 2005, the last date listed on Kasgro's Purchase Order, Kasgro ran out of "Sill Plates" only three times, and for no more than two or three working days each time. (Kahrer Aff. Ex. A.) Kasgro responds that, in addition to having to shut down, it was also forced to operate at less than capacity. (Plut Aff. II ¶ 7.)

Ryerson contends that, during the course of the project, Kasgro and Ryerson were in constant communication and that when Kasgro had need of a particular part, its Material Manager, Chas Kahrer, would contact Ryerson, usually through Ryerson's Inside Sales Representative, Jo Mondine, to ask that Ryerson prioritize certain parts, and Ryerson would attempt to comply with Kasgro's request. (Kahrer Dep. at 62-63, 68-69; Bowman Dep. at 157-63; Mondine Dep. at 55-56, 105-06.[19])

Kasgro states that, after each missed delivery date, it notified Ryerson of its breach and informed it of the effect it was having on the Loram build. (Kahrer Aff. ¶ 7.) Ryerson responds that Kasgro did not communicate to it prior to August 2005 that the timing of Ryerson's

---

[19]Docket No. 54 Ex. C.

deliveries of steel was a "problem." (Bowman Dep. at 157-60.)  It further states that Kasgro did

not notify Ryerson of any alleged breach of the contract until October 2005. (Docket No. 62 Exs.

23, 32; Plut Dep. at 32-33; Odden Dep. I at 122-23.)

To ensure that it could continue production, Kasgro started identifying the mandatory or

"hot parts" that it needed immediately to avoid further plant shut downs and employee idle time.

(Mondine Dep. Ex. 10, 13, 14;[20] Docket No. 54 Exs. D, E, F.)  Kasgro then communicated its

need for these "hot parts" to Ryerson.  (Kahrer Aff. ¶ 8.)  Ryerson admits that Kasgro would

routinely identify "hot parts" and ask that Ryerson prioritize delivery of those parts, and that

Ryerson attempted to comply with Kasgro's requests.  (Kahrer Dep. at 68-69; Bowman Dep. at

163.)

Kasgro states that Ryerson was aware of the importance of Kasgro having these parts and

the effect its late deliveries was having on Kasgro. (Mondine Dep. at 68-69;[21] see also Mondine

Dep. Ex. 10.)  Kasgro also states that, upon each notice of breach, Ryerson's authorized

representatives, including Mondine and Bowman, assured Kasgro that product, especially "hot

parts," would be delivered within a short period of time, generally a day or two.  (Kahrer Aff.

¶ 9.)  It further states that it relied on Ryerson's promises and instructed its employees to report

to work each day, expecting to have the necessary parts to keep them busy.  (Plut Aff. II ¶ 7.)

According to Kasgro, Ryerson's components would often not show up until late in the day, or

many times, not at all, leaving these employees with little or nothing to do.  (Plut Aff. II ¶ 7;

Kahrer Aff. ¶ 9.)

_____

[20]All exhibits to Mondine's deposition are contained in Docket No. 54 Ex. C.

[21]Docket No. 54 Ex. C.

Ryerson responds that, in the event there is no work for an employee to do, Kasgro had the ability to send its non-unionized employee workforce home and pay them for only four hours. It contends that Kasgro had no obligation under law, a collective bargaining agreement or anything else to pay its employees to remain at work and do "little or nothing." Executive Vice President Jeffrey Plut testified that Kasgro was obligated to pay an employee for a minimum of four hours even if there was no work for that employee to do. (Plut Dep. at 189.)[22]

Ryerson notes that David Stull, Kasgro's Plant Manager, testified that although Kasgro has a non-unionized workforce, is under no obligation to pay "idle" employees that are sent home, and makes no guarantee that it will provide eight hours of work to its employees each day. Kasgro has never sent employees home for lack of work. (Stull Dep. at 120-21.)[23]

Ryerson contends that Kasgro never made a claim for damages or requested a setoff while Ryerson still had steel to deliver. (Plut Dep. at 66-67; Kahrer Dep. at 87-88.) Kasgro responds that it constantly insisted on timely performance and that it made its notice to Ryerson of its intention to stop paying on August 2, 2005. (McFall Aff. Ex. A.)

Kasgro points to the following documented communications:

1) a June 30, 2005 fax from Mondine to Ryerson's vendor, Walter Long, stating "Here is the HOT list that Kasgro has given me, they need them ASAP." (Docket No. 54 Ex. D);

2) an August 4, 2005 email in which Mondine told Kasgro's Chas Kahrer that she finally managed to reenter Kasgro's orders into the new computer system and that:

As far as the 2 parts you spoke to me on ... I got with Kent and the shop. The good news is that they were started 8/2/05, bad news is that they are not scheduled

_____

[22]Docket No. 62 Ex. 7.

[23]Docket No. 62 Ex. 8.

to be ALL complete until week 8-15.  Kent has asked the shop to please get pairs of each done and to advise when we can start picking up the pairs to keep you moving.  I will let you know what they respond.

Sorry for all of these problems with the conversion.  (Docket No. 54 Ex. G);

3) a set of emails dated August 4, 2005 in which Mondine told Ed Coholich that "I have 2 items that are EXTREMELY HOT.  Customer needs parts by tomorrow" and that:

We need these parts in pairs. When can we start picking up sets of 2.  Any help you can give will be greatly appreciated.  The customer needs these parts for production now. [They] literally have 80 people waiting on these.  This is the first part that goes on the car and they can't build without them.  (Mondine Dep. Ex. 10.)

4) an August 11, 2005 fax from Mondine to Long stating that Ryerson would be picking up certain parts that day and that "As soon as anything else becomes ready let me know.  Customer wants everything ASAP, they need to finish this job next week."  (Docket No. 54 Ex. E);

5) an August 17, 2005 fax in which Mondine repeated this statement to Long (Docket No. 54 Ex. F);

6) an August 17, 2005 email in which Kent Bowman told Mondine to enter the orders immediately "to get Kasgro what they need.  They shouldn't suffer because of these issues."  (Mondine Dep. Ex. 14); and

7) an August 25, 2005 email in which Mondine stated: "Here is what I need picked up and delivered to Kasgro, ASAP. Customer wants tomorrow 8/26/05.... Please advise as soon as you have this arranged, Kasgro needs answers NOW." (Mondine Dep. Ex. 13.)

The New Computer System

On August 1, 2005, Ryerson implemented a SAP enterprise software system in its

Carnegie location.  (Bowman Dep. at 185; Mondine Dep. at 94.)  This implementation had been

planned by Ryerson prior to entering into the contract with Kasgro.  The implementation of the

SAP system required Ryerson to reenter onto its computers information about outstanding orders.

(Mondine Dep. at 59-62;[24] Docket No. 62 Ex. 17; Kahrer Dep. Ex. 64.[25])

Ryerson refused to deliver product until all customer orders were reentered into the system. According to Mondine, "there wouldn't be a delivery, if the order wasn't entered." (Mondine Dep. at 62.) This was true even if product was complete and ready for shipment.

Kasgro asserts that this refusal to deliver further delayed Ryerson's already late delivery of parts. (Mondine Dep. at 62.) Ryerson responds that, although it was unable to deliver product until it had all customer orders entered into the SAP system, all orders were reentered onto SAP by August 4, 2005. (Mondine Dep. at 62-64; Docket No. 62 Ex. 17; Kahrer Dep. at 94-96.) Ryerson asserts that there is no evidence that Kasgro was out of parts or forced to shut down production at any time between August 1, 2005 and August 4, 2005. See Docket No. 62 Exs. 24-25.

Kasgro responds that the implementation of the new system caused numerous delivery problems, delaying Kasgro and forcing it to shut down or operate at less than full capacity, and that Mondine admitted that the system was so bad that it affected everything at Ryerson and led to her quitting her job at Ryerson. (McFall Aff. Ex. A; Mondine Dep. at 61, 76[26].)

When Kasgro learned of the SAP implementation and the problems it was causing, Kasgro again complained and demanded product. (Kahrer Aff. ¶ 10.) Ryerson apologized and advised Kasgro that its complete order would be delivered by August 1. Then August 12. Then August 15. Then August 19. Then August 22. Then August 26. And so on. (Kahrer Aff. ¶ 10.)

---

[24]Docket No. 54 Ex. C.

[25]Def.'s App. Ex. G.

[26]Docket No. 54 Ex. C.

Ryerson does not contest that Kasgro demanded product. However, as Ryerson did not implement the SAP system at its Carnegie location until August 1, 2005, Ryerson denies that Kasgro elicited a promise from Ryerson of delivery by August 1 after complaining about SAP implementation. Kasgro's telling Ryerson about specific part needs was part of the course of performance established between the parties. (Kahrer Dep. at 62-63, 68-69; Bowman Dep. at 159-60, 163; Mondine Dep. at 55-56.)

<u>Kasgro Decides to Stop Paying</u>

In mid-July, Kasgro's Executive Vice President, Jeff Plut, met with Kasgro Accounting Analyst Scott McFall. (Plut Aff. II ¶ 8; McFall Aff. ¶ 6.)[27] During that meeting, Plut instructed McFall that, because of Ryerson's repeated failures to deliver goods and the resulting problems to inform Ryerson that, due to its late deliveries, Kasgro intended to withhold payment on future invoices and not pay those invoices in full. (Plut Aff. II ¶ 8; McFall Aff. ¶ 6; Plut Dep. Ex. 6.[28])

Ryerson points out that Plut made this decision unilaterally and that while Kasgro would not pay future invoices from Ryerson, Kasgro would continue to accept deliveries from Ryerson. (Plut Dep. at 67-68.) In fact, after that date, Plut and other Kasgro employees continued to pressure Ryerson for additional deliveries. (Kahrer Dep. at 88.)

On August 2, 2005, McFall spoke with Ryerson's Michael Falasz by telephone. During

---

[27]Ryerson contends in its reply brief (Docket No. 65 at 4) that Kasgro cannot refer to Scott McFall's affidavit because it did not name him as a potential witness in its Pretrial Statement. However, Kasgro indicated in that document that it might call any person named in any pleadings, interrogatory answers or other discovery requests, depositions, documents produced and/or pretrial statement filed by Ryerson, and that it reserved the right to supplement its witness listing. (Docket No. 42 at 5.) In addition, McFall's statements are consistent with those of Jeff Plut, and Ryerson has not challenged Kasgro's right to submit Plut's affidavits.

[28]Pl.'s App. Ex. 8.

that call McFall told Falasz, per Plut's instructions, that due to Ryerson's repeated failures to deliver parts Kasgro would not be remitting any payments before August 12, 2005, and that when Kasgro did make its next payment, he was unsure of how much it would send.  (McFall Aff. ¶ 7 & Ex. A.)

Falasz memorialized this communication in his e-mail message of the same date, where he passed on the warning to the other decision-makers at Ryerson:

> HELP!  I NEED SOME CLARIFICATION.  TODAY I SPOKE TO SCOTT McFALL IN THEIR ACCOUNTS PAYABLE DEPARTMENT.  I WAS CALLING FOR THE $229,012 THAT IS PRESENTLY 60-83 DAYS OLD.  SCOTT TOLD ME HE DOESN'T EXPECT TO MAIL ANYTHING UNTIL AUGUST 12.  HE ALSO COULD NOT STATE HOW MUCH MAY GO THAT DAY.  THIS MEANS IT MAY WELL BE 2 WEEKS BEFORE WE SEE THAT CHECK AND THEN WE DO NOT KNOW HOW MUCH IT WILL BE.  WHEN I ASKED WHY THERE IS SUCH A DELAY, HE SAID THEY ARE HAVING TROUBLE GETTING PRODUCT OUT THE DOOR DUE TO DELAYS FROM US ON DELIVERIES.  I OBJECTED TO THAT BUT HE SAID HIS PRODUCTION PEOPLE ASSURED HIM WE ARE DELINQUENT ON DELIVERIES.  THIS IS NOT WHAT I WAS TOLD LAST WEEK WHEN I WAS IN PITTSBURGH.  PLEASE HELP CLEAR THIS UP.  IF WE ARE TRULY CAUSING DELAYS IN THEIR CASH FLOW I NEED TO BE CLEAR ON THAT.  IF THEY ARE THEIR OWN PROBLEM, THEY SHOULD NOT BE POINTING FINGERS AT US.  THEIR HUGE DOLLARS OWED AND THE SLOWNESS WE ARE EXPERIENCING ARE GOING TO HAVE AN IMPACT ON THE PLANT (AND THEIR OWN) DSO.  PLEASE ADVISE. THANKS!

 (McFall Aff. Ex. A.)

On August 3, 2005, Kent Bowman responded to Falasz's email as follows:

The original due date for completion of this order was July 8.  We have been able to keep production happy until last week.  20 pcs. of Part # 133891 Detail 3 were ready for pick up at Walter Long last Thursday (7-28).  We hired a truck to take them to Kasgro.  The paperwork arrived at Kasgro and the parts didn't.  We thought Kasgro had them and told them so.  They didn't receive them until Monday.  This cost them several days of production.

I was at Kasgro yesterday because 6 of the 20 were burned incorrectly.  I

overheard Chaz on the phone with accounting. Accounting was asking him if we had caused any delays and he told them about his situation.

To make matters worse we owe them 20 more of this part and we are having problems moving it from shop to shop because of SAP issues.

(Bowman Dep. Ex. 20.)[29]

Plut states that, from late July to late August 2005, Ryerson's Kent Bowman was often at Kasgro's plant. (Plut Aff. II ¶ 9.) During Bowman's visits, Plut told him on several occasions that Ryerson was costing Kasgro excess labor and overhead, not only for the late material deliveries, but also because of all of the deliveries of parts which were wrong and either unusable or needed to be reworked. Plut states that these discussions became more frequent about the second week of August, after he found out that Ryerson was not shipping steel due to the internal computer system conversion. (Plut Aff. II ¶ 9.)

Ryerson responds that Bowman kept detailed notes of customer calls and plant visits in a computer program called "Artie," and that a review of the program reveals no records that Bowman spoke to Plut during any of the four visits he made to Kasgro during July and August 2005. (Bowman Dep. at 83;[30] Bowman Dep. Ex. 27 at RYS 000305-000311.[31])

Kasgro notes that it never stopped paying Ryerson. (McFall Aff. ¶ 8.) Kasgro paid Ryerson $1,559,250.60 including the following payments made after July 14, 2005: $221,786.61 on August 4, 2005; $471,442.77 on August 12, 2005; $98,936.00 on August 19, 2005; $196,977.41 on September 9, 2005; $313,199.47 on September 27, 2005; and $88,903.79 on

---

[29]Docket No. 54 Ex. B.

[30]Pl.'s App. Reply Br. (Docket No. 67) Ex. 1.

[31]Docket No. 67 Ex. 2.

17

October 6, 2005. (McFall Aff. ¶ 8 & Ex. B; Plut Aff. II ¶ 10 & Ex. C.)

Ryerson asserts that Kasgro chose not to inform Ryerson of this decision while the deliveries continued and that Ryerson did not learn of Kasgro's decision or intent not to pay the outstanding invoices until October 20, 2005 – after Ryerson's last delivery – when Plut sent Ryerson a letter demanding a setoff of $703,000.00. (Plut Dep. Ex. 2;[32] Plut Dep. at 32-33; Odden Dep. at 122-23).

Kasgro has not paid Ryerson the invoiced amounts for all of the steel it received. (Compl. ¶ 12; Answer ¶ 12; Plut Dep. at 63-68.) According to Kasgro's accounting system and Plut, $788,204.76 remains due and owing to Ryerson from Kasgro for the goods that Ryerson delivered. (Plut Dep. Ex. 6; Plut Dep. at 63-65.) Kasgro states that it withheld this amount from Ryerson as it was entitled to do, subject to its own claims for damages, pursuant to 13 Pa. C.S. § 2717.

According to Kasgro, Ryerson's late deliveries forced Kasgro to shut down production or operate the plant at less than full capacity repeatedly during July, August and September 2005. (Kahrer Aff. Ex. A; Bowman Dep. Ex. 20.) According to Plut, due to Ryerson's late deliveries and unfulfilled promises, Kasgro incurred the expense of paying a plant full of employees to do nothing, and incurred other additional overhead costs that could not be allocated to other jobs, due to the unique layout of the plant required to accommodate the Loram build. (Plut Aff. I ¶ 8.)

Ryerson denies that the timing of its deliveries caused Kasgro to "incur the expense of paying a plant full of employees to do nothing." Kasgro had no obligation under the law, a collective bargaining agreement or anything else to pay its employees to remain at work and do

---

[32]Pl.'s App. Ex. 7.

"little or nothing." (Stull Dep. at 121; Plut Dep. at 189.[33])  In addition, Ryerson did not know that Kasgro had configured its plant in a "unique" way for the Loram job.  (Bowman Dep. at 165; Mondine Dep. at 109-10.)

Kasgro states that it has suffered damages in excess of $715,000.  (Plut Aff. II ¶ 11.)  This is the approximate amount that Kasgro seeks from Ryerson in this litigation as a result of Ryerson's failure to deliver parts in a timely manner.  (Plut Aff. II ¶ 11.)  This conclusion is based upon Kasgro's review of its business records, as well its my discussions with Greg Clark, the expert witness retained by Kasgro, and the report created by Clark at Kasgro's request.  (Plut Aff. II ¶ 11.)

Ryerson notes that Kasgro was still receiving materials such as wheels, brakes, bolts, washers, gaskets and slack adjusters from other vendors through August and September 2005.  (Kahrer Dep. at 158-65.)  Kasgro has not asserted any claims against any other vendors, besides Ryerson, that provided material for the Loram contract.  (Plut Dep. at 31-32.)

Kasgro responds that these parts were not late, but rather it saw no purpose in paying for and storing these parts until it received Ryerson's Sill Plates, to which every other part had to be attached.  (Plut Aff. II ¶ 6.)

Ryerson notes that Kasgro's Vice President of Engineering did not identify any steel delivery issues on the weekly progress reports it sent to Loram until August 22, 2005.  (Odden Dep. II at 35-36, 40-41.)  It further notes that Kasgro's Material Manager did not discuss any delivery issues it was having with Ryerson with its customer, Loram.  (Kahrer Dep. at 174-75.)

The parties agree that Ryerson eventually delivered all ordered goods to Kasgro.  (Compl.

---

[33]Docket No. 62 Ex. 7.

¶ 7; Answer ¶ 7.)  They further agree that Kasgro accepted these goods and used them in its manufacture of rail cars for Loram.  (Compl. ¶ 10; Answer ¶ 10.)

However, Kasgro contends that all of Ryerson's materials were not received until September 14, 2005, about two months after delivery was required to be completed per the terms of the contract.  (Kahrer Aff. ¶¶ 10-11; Kahrer Dep. Ex. 72.[34])

Kasgro completed the manufacture of all of the rail cars for Loram.  (Plut Dep. at 139.) Ryerson notes that the record indicates that Kasgro completed those rail cars in a timely manner. (Plut Dep. at 68, 138-39.)[35] Loram has paid Kasgro the full contract price for the rail cars without any deductions for late delivery or any other reasons.  (Plut Dep. at 31; Lowe Dep. at 136.) Ryerson notes that this contract contained a liquidated damages clause in the event Kasgro was late delivering the cars to Loram, but it was not invoked.  (Docket No. 62 Ex. 26 at K-1480.)

Finally, Ryerson notes that, while it was still delivering steel to Kasgro and Kasgro was still assembling the base cars for Loram, Kasgro and Loram contracted for Kasgro to construct a top-deck assembly for each of the 81 spine cars.  Kasgro built the top-deck assemblies (using no parts provided by Ryerson) at Kasgro's plant and stored the cars there until at least December 2005. (Plut Dep. at 116, 121-23, 209-10;[36] Docket No. 62 Ex. 30.)  Thus, Ryerson contends that the record demonstrates that Loram was satisfied with Kasgro's performance.

Procedural History

Plaintiff filed this action on July 6, 2006.  Jurisdiction is based on diversity of citizenship

---

[34]Docket No. 47 Ex. 6.

[35]Docket No. 62 Ex. 7.

[36]Docket No. 62 Ex. 7.

in that Ryerson is a corporation incorporated under the laws of the State of Delaware with a

principal place of business in Chicago, Illinois; Kasgro is a corporation incorporated under the

laws of the Commonwealth of Pennsylvania with a principal place of business in New Castle,

Pennsylvania; and the amount in controversy exceeds the sum of $75,000, exclusive of interest

and costs.  (Compl. ¶¶ 2-4; Answer ¶¶ 2-4.)  The complaint alleges that Defendant breached the

contract by failing to pay for the steel products Plaintiff delivered (Count I) and also contains

claims promissory estoppel (Count II) and unjust enrichment (Count III).  On August 23, 2006,

Defendant filed an answer and counterclaim for breach of contract, in which it contends that

Plaintiff failed to deliver goods by the dates specified and that these delays caused it to incur

damages, for which it seeks recovery.

On April 16, 2008, the parties filed cross-motions for partial summary judgment.

Summary Judgment

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving

party, "the pleadings, depositions, answers to interrogatories and admissions on file, together

with the affidavits, if any, show that there is no genuine issue of material fact and the movant is

entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  Summary judgment may be

granted against a party who fails to adduce facts sufficient to establish the existence of any

element essential to that party's case, and for which that party will bear the burden of proof at

trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party bears the initial

burden of identifying evidence which demonstrates the absence of a genuine issue of material

fact.  Once that burden has been met, the non-moving party must set forth "specific facts showing

that there is a genuine issue for trial" or the factual record will be taken as presented by the

moving party and judgment will be entered as a matter of law. <u>Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. <u>Anderson v. Liberty-Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

Ryerson argues that it is entitled to summary judgment because it manufactured and delivered parts to Kasgro in accordance with the contract, but Kasgro withheld and has refused to pay it the sum of $788,204.76, in breach of the contract. Kasgro responds that Ryerson is the party that breached the contract by failing to meet specified delivery dates, that this breach was material to the contract and that it suffered damages as a result. Therefore, it contends that Ryerson's motion for partial summary judgment should be denied and that its own motion for partial summary judgment should be granted.

<u>Breach of Contract Under Pennsylvania Law</u>

In a breach of contract action, a plaintiff must demonstrate: "(1) the existence of a contract, (2) a breach of a duty imposed by the contract, and (3) damages." <u>Sullivan v. Chartwell Investment Partners LP</u>, 873 A.2d 710, 716 (Pa. Super. 2005) (citation omitted). Ryerson has demonstrated the existence of all of these elements: the parties had a contract for the purchase of steel goods, Ryerson delivered the parts requested, Kasgro did not remit payment for all of the goods received and Ryerson was damaged in the amount of $788,204.76. Kasgro does not dispute these points.

However, Kasgro has presented evidence that the contract required Ryerson to deliver goods by specific dates, and the record is undisputed that Ryerson did not meet these dates. In order to grant Ryerson's motion for summary judgment, the Court would have to conclude that

specified delivery dates were not a material term of the contract or that Kasgro had no right under the law to withhold payments because of Ryerson's delays. As explained below, neither of these propositions has been demonstrated.

### Materiality of Specific Delivery Dates

Kasgro has proffered evidence that the contract contained specific delivery dates. Its representatives raised the issue with Ryerson's representatives during contract negotiations and the Purchase Orders contained them. Ryerson argues that its practice is not to promise to meet specific delivery dates, that it did not do so in this case and that it would not have accepted the Purchase Orders if it understood that Kasgro would insist upon specific delivery dates and would consider failure to meet such dates a breach of the contract. However, even one of Ryerson's own representatives admitted that, when Ryerson received the Purchase Orders containing specified delivery dates following discussions about this matter and began fabricating the steel components, a contract had been formed which included these delivery dates.

Pennsylvania law recognizes that "a material breach by one party to a contract entitles the non-breaching party to suspend performance." Widmer Eng'g, Inc. v. Dufalla, 837 A.2d 459, (Pa. Super. 2003) (citations omitted), appeal denied, 852 A.2d 313 (Pa. 2004). "For a breach of contract to be material, it must go to the essence of the contract; it must be of sufficient importance to justify non-performance by the non-breaching party." Norfolk S. Ry. Co. v. Basell USA, Inc., 512 F.3d 86, 92 (3d Cir. 2008) (citations omitted). The Court of Appeals has stated that:

> Whether the breach of a contract is material is generally an issue of fact. Saienni v. G & C Capital Group, Inc., No. 96C-07-151, 1997 WL 363919, at *3 (Del. Super. May 1, 1997); 23 Richard A. Lord, Williston on Contracts § 63:3 (4th ed. 1992). However, "[a]s is true of virtually any factual question, if the

23

materiality question in a given case admits of only one reasonable answer (because the evidence on the point is either undisputed or sufficiently lopsided), then the court must intervene and address what is ordinarily a factual question as a question of law." <u>Gibson v. City of Cranston</u>, 37 F.3d 731, 736 (1st Cir. 1994); accord <u>Saienni</u>, 1997 WL 363919, at *3; 23 <u>Williston on Contracts</u>, supra, § 63:3. Thus, in certain situations, it can be appropriate to determine the issue of material breach at the summary judgment stage.

<u>Id.</u> at 92-93 (footnote omitted).

This case is not one of the certain situations in which the question of material breach can be resolved on summary judgment. The record contains genuine issues of material fact as to the question of whether the delivery dates were material to Ryerson's performance. Ryerson contends that they were not, citing the following facts: 1) Kasgro ran out of Sill Plates for no more than thirteen working days, and only seven of them were during the period between the first and last scheduled delivery dates; 2) the parties were in constant communication throughout the contract period, yet Kasgro never indicated that Ryerson's deliveries were a problem until mid-August 2005; 3) Kasgro continued to receive materials from other vendors through August and September 2005 but did not withhold payments from these vendors or charge them with breach of contract; and 4) Kasgro did not inform Loram of the delays, Loram did not invoke a penalty clause for the late deliveries and Loram even entered into another contract with Kasgro, demonstrating that it was satisfied with Kasgro's performance.

However, Kasgro has presented evidence that it did complain to Ryerson about late deliveries and has explained that the other vendors were not late but their parts were not needed until it received the Sill Plates from Ryerson. Kasgro maintains that Ryerson's late deliveries damaged it not by delaying its own deliveries to Loram, but by causing Kasgro–which had dedicated its entire facility to the Loram job and therefore it could not work on other projects–to

incur cost overruns because of lost man hours. Ryerson may dispute this point with evidence at trial.

If the trier of fact concludes that the specific delivery dates were material to the Purchase Orders, then Ryerson's failure to meet these delivery dates constituted a breach of a material term thereto and it cannot recover all of the amounts Kasgro withheld. On the other hand, if the trier of fact concludes that specific delivery dates were not material to Ryerson's performance, then its failure to meet these dates would not demonstrate a material breach of the contract and Kasgro would owe Ryerson the amounts it did not pay. Therefore, Ryerson's motion for partial summary judgment should be denied.

Kasgro's Right to Withhold Payment

The Pennsylvania Uniform Commercial Code provides that:

Incidental damages resulting from the breach of the seller include:

(1) expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected;

(2) any commercially reasonable charges, expenses or commissions in connection with effecting cover; and

(3) any other reasonable expense incident to the delay or other breach.

13 Pa. C.S. § 2715(a). The Code further provides that:

The buyer on notifying the seller of his intention to do so may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract.

13 Pa. C.S. § 2717. See Beaver Valley Alloy Foundry Co. v. Therma-Fab, Inc., 814 A.2d 217, 221 (Pa. Super. 2002).

Kasgro contends that it was entitled, under these Code sections, to withhold and set off

any and all reasonable expenses incurred as a result of Ryerson's failure to timely deliver the contract goods, including extended overhead. It further argues that it complied with the Code provisions by notifying Ryerson that it intended to deduct the expenses it incurred as a result of Ryerson's delays and it then did so.

Ryerson responds that Kasgro need not have incurred any expenses because it could have sent its workers home when there was no work to do. Kasgro responds that the components would not be delivered on days when they were expected or that they would arrive late in the day so that employees would be waiting for them with nothing to do. (Plut Aff. II ¶ 7.) Jeffrey Plut testified that Kasgro was obligated to pay an employee for a minimum of four hours even if there was no work for that employee to do. (Plut Dep. at 189.) The Court cannot resolve this disputed issue in the context of the motions for summary judgment.

More fundamentally, the issue of whether Kasgro was permitted to withhold payments because it incurred damages due to Ryerson's late deliveries is the complement to the one addressed above, namely whether Ryerson's failure to meet specified delivery dates constituted a material breach of the contract. For the same reasons, the Court cannot determine on the motions for summary judgment whether Kasgro properly withheld damages it incurred because of Ryerson's late deliveries, because its right to do so depends on whether Ryerson's late deliveries constituted a material breach of the contract. Therefore, Kasgro's motion for partial summary judgment should be denied.

For these reasons, it is recommended that the motion for partial summary judgment submitted on behalf of Plaintiff, Joseph T. Ryerson & Son, Inc. (Docket No. 45,) be denied. It is further recommended that the motion for partial summary judgment submitted on behalf of

Defendant, Kasgro Rail Corporation (Docket No. 49), be denied.

Within thirteen (13) days of being served with a copy, any party may serve and file written objections to this Report and Recommendation. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,

s/Robert C. Mitchell
ROBERT C. MITCHELL
United States Magistrate Judge

Dated: August 8, 2008